Slip Op. 17-158

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| INMAX SDN. BHD. and INMAX INDUSTRIES SDN. BHD., <br><br>　　　　　　　Plaintiffs, <br><br>　　　v. <br><br>UNITED STATES, <br><br>　　　　　　　Defendant. | Before: Leo M. Gordon, Judge <br><br> Court No. 17-00205 |

**OPINION and ORDER**

[Changed Circumstances Review Remanded.]

Dated: December 4, 2017

　　　Gregory S. Menegaz, J. Kevin Horgan, Alexandra H. Salzman, and Judith L. Holdsworth, deKieffer & Horgan, PLLC of Washington, DC for Plaintiffs Inmax Sdn. Bhd. and Inmax Industries Sdn. Bhd.

　　　Stephen C. Tosini, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, for Defendant United States. With him on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, and Eric J. Singley, Trial Attorney. Of counsel on the brief was David W. Richardson, Senior Counsel, U.S. Department of Commerce, Office of the Chief Counsel for Trade and Enforcement and Compliance of Washington, D.C.

　　　Adam H. Gordon and Ping Gong, The Bristol Group PLLC, of Washington, DC for Defendant-Intervenor Mid Continent Steel & Wire, Inc.

　　　Gordon, Judge: Plaintiffs challenge the initiation of a changed circumstances review by the U.S. Department of Commerce ("Commerce") less than 24 months after publication of the notice of the underlying final less than fair value determination. See Certain Steel Nails from Malaysia, 82 Fed. Reg. 34,476 (Dep't of Commerce July 25,

2017) ("Final Results"), and accompanying Issues and Decision Memorandum for the Final Results of the Antidumping Duty Changed Circumstances Review of Certain Steel Nails from Malaysia (Dep't of Commerce July 14, 2017), available at http://enforcement.trade.gov/frn/summary/malaysia/2017-15518-1.pdf (last visited this date) ("Decision Memorandum"); Plaintiffs' Rule 56.2 Mem. Supp. Mot. for J. upon the Agency R., ECF No. 36 ("Pls.' Br."); Def.'s Resp. to Pls.' Rule 56.2 Mot. for J. on the Agency R., ECF No. 37 ("Def.'s Resp."); Pls.' Reply Br., ECF No. 39. The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516(a)(2)(B)(iii) (2012),[1] and 28 U.S.C. § 1581(c) (2012).

## I. Background

Plaintiff Inmax Sdn. Bhd. ("Inmax") was a mandatory respondent in the less-than-fair-value investigation of certain steel nails from Malaysia ("subject merchandise") and was assigned a total adverse facts available ("AFA") rate of 39.35%. Certain Steel Nails from Malaysia, 80 Fed. Reg. 28,969 (Dep't of Commerce May 20, 2015) ("Final LTFV Determination"). Prior to the preliminary determination, Inmax requested that it be collapsed with its affiliated company Inmax Industries Sdn. Bhd. ("Inmax Industries"). Both companies shared the same parent, Inmax Holding Co. Ltd. ("Inmax Holding"). Commerce in its preliminary determination did not collapse Inmax and Inmax Industries. No party challenged that decision, and Commerce did not collapse the companies in the final determination. This proved fortunate for Inmax Industries (and its parent Inmax

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

Holding) because Inmax was assigned a total adverse facts available rate of 39.35%, whereas Inmax Industries was assigned the all others rate of 2.66%.

After release of the <u>Final LTFV Determination</u>, Inmax Holding filed a letter with the Taiwan Stock Exchange in which it explained, in pertinent part:

> The [United States] initiated antidumping and countervailing duty investigations on Certain Steel Nails from Malaysia . . . . We have been notified that the U.S. Department of Commerce (DOC) made an affirmative final determination that assigned a final antidumping duty rate of 39.95% to [Inmax]. We are very concerned about DOC's determination, and have asked our counsel to find out the details.
>
> Our subsidiary, [Inmax Industries] have not been investigated by the DOC in the antidumping and countervailing duty investigations. According to the U.S. official information, our subsidiary [Inmax Industries] final duty rate is 2.61%. Because of the tax variation factor, our subsidiary [Inmax] will make sales to the U.S. market through new factory Inmax Indust[ries]' production line and will have some temporary changes because of the business adjustment in the near future. After the temporary adjustment, we expect that it will stabilize its production line and its U.S. market.

Joint Appendix 5**.**

Four months after the <u>Final LTFV Determination</u> (in September 2015), Mid Continent Steel & Wire, Inc. ("Petitioner") requested that Commerce initiate a changed circumstances review, alleging that U.S. import data demonstrated a sharp decline in imports of subject merchandise for Inmax and a corresponding increase in imports of subject merchandise for Inmax Industries. Petitioner alleged that Inmax was potentially evading the antidumping duty order by shipping production through Inmax Industries and its lower "all others" rate. Petitioner highlighted the quoted language above from Inmax Holding's Taiwan Stock Exchange notice. Commerce, in turn, determined that the requisite statutory "good cause" existed to conduct a changed circumstances review

within 24 months of the investigation, 19 U.S.C. § 1675(b)(4), emphasizing "new trading patterns" among the Inmax companies and "possible evasion of the Order." Certain Steel Nails from Malaysia, 80 Fed. Reg. 71,772 (Nov. 17, 2015) (notice of initiation). Commerce ultimately collapsed Inmax and Inmax Industries, a decision no party disputes. Decision Memorandum at 4. Plaintiffs instead focus on the changed circumstances review itself, arguing that Commerce lacked the requisite good cause. Id. at 4-14. During the course of the changed circumstances review, Plaintiffs and Petitioner requested a periodic review, and Commerce initiated the first administrative review ("AR") in September 2016. Pls.' Br. at 12. The cash deposit rates assigned in the investigation to the Inmax companies will therefore not ripen into assessed antidumping duties, but instead be superseded by actual calculated rates for the covered entries, with any difference between the cash deposits and actual assessment trued up at liquidation (any underpayment payable plus interest, any overpayment refunded plus interest). See 19 C.F.R. § 351.212.

## II. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr. Administrative Law and Practice § 9.24[1] (3d ed. 2017). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2017).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

### III. Discussion

The antidumping statute requires "good cause" for Commerce to conduct a changed circumstances review within 24 months after an investigation. 19 U.S.C.

§ 1675(b)(4).[2] "Good cause" is a term of art (most common in the labor and employment law context) that translates simply to a "legally sufficient reason." CAUSE, Black's Law Dictionary (10th ed. 2014). The "good cause" standard is "higher than the regular standard" for initiating a changed circumstances review. Decision Memorandum at 11. If a typical changed circumstances review requires changed circumstances, then logic dictates that Commerce's "higher" standard requires something more than just changed circumstances, or more simply, changed circumstances "plus."

As noted above, Petitioner identified evidence of potential evasion by Inmax, and Commerce reasoned, "if preventing evasion of an order is not 'good cause,' then it is difficult to imagine what would be 'good cause.' . . . it is difficult to imagine a better cause for initiating a [changed circumstances review] than preventing evasion of an order by one company through the use of an affiliated company." Id. This strikes the court as a reasonable response to the facts before Commerce at the time of initiation of the review. Inmax, a mandatory respondent that participated in the investigation received a total AFA rate of 39.35%. Its affiliate Inmax Industries, also an interested party that participated in the investigation, received the all others rate of 2.66%. Shortly after the investigation, Inmax dramatically reduced its exportation of subject merchandise, while affiliate Inmax Industries increased its exportation of subject merchandise. Those changed

---

[2] There is also a "parroting regulation," 19 C.F.R. § 351.216(c), that "does little more than restate the terms of the statute itself," Gonzales v. Oregon, 546 U.S. 243, 257 (2006), which means the issue here does not involve Commerce's interpretation of its regulation, but Commerce's application and interpretation of the statutory provisions themselves. See id. ("the existence of a parroting regulation does not change the fact that the question ... is not the meaning of the regulation but the meaning of the statute.").

circumstances <u>plus</u> the public statement from Inmax Holdings that Inmax would "make sales to the U.S. market through new factory Inmax Indust[ries]' production line" was sufficient to warrant a closer look from Commerce. There were changed circumstances—the change in trading patterns—plus the <u>potential</u> evasion by Inmax shipping its subject merchandise through Inmax Industries.

Interestingly, though, when Commerce took that closer look in the changed circumstances review, it found that Inmax was <u>not</u> shipping any of its merchandise <u>through</u> Inmax Industries. According to Commerce, "the evidence does not show that [Inmax] is producing merchandise at its facility and then exporting that merchandise through Inmax Industries." <u>Id.</u> at n.26. Instead, Inmax apparently ceased production of subject merchandise in response to the 39.35% rate. Inmax Industries, on the other hand, developed its own production lines and has been exporting its own subject merchandise pursuant to its duly assigned all-others rate. It is important, therefore, to note that there was no <u>actual</u> "evasion" of the antidumping order, at least as the court understands that term. Evasion connotes illegality in the entry of subject merchandise. <u>See</u> 19 U.S.C. § 1517(a)(5) (defining "evasion"). Had Inmax shipped its merchandise (subject to a 39.35% rate) through Inmax Industries (and its 2.66% rate), <u>that</u> would have been an illegal evasion of the order, <u>id.</u>, and may have engendered a referral from Commerce to U.S. Customs and Border Protection pursuant to 19 U.S.C. § 1517(b)(3) for further investigation under 19 U.S.C. § 1517 ("Procedures for investigating claims of evasion of antidumping and countervailing duty orders"). But that's not what happened. Parent Inmax Holding's letter to the Taiwan Stock Exchange was not a pronouncement of an

impending fraudulent export scheme among its subsidiary companies, but a simple misstatement of otherwise lawful activity under an antidumping duty order. To recap, Commerce <u>did not</u> collapse the Inmax companies, assigning each company its <u>own</u> rate (both of which were derivative, with one based on the petition rate, and the other based on the all others rate). Inmax Industries therefore received its own rate, and lawfully produced subject merchandise for exportation at that rate (rather than unlawfully export subject merchandise produced by its affiliate Inmax).

Although the court believes Commerce had good cause to initiate the changed circumstances review—there were changed circumstances <u>plus</u> the possibility of evasion—the subsequent finding by Commerce that Inmax was <u>not</u> shipping its merchandise through Inmax Industries, does alter the dynamics of the proceeding and challenges the reasonableness of several aspects of Commerce's subsequent decision. The court therefore must remand this matter to Commerce for further explanation.

As noted, Commerce found that the Inmax companies did <u>not</u> illegally co-mingle subject merchandise in their exports, and that their parent publicly, and transparently, communicated a change in their export behavior due to the differing assigned rates. Commerce does acknowledge that "this avoidance could be seen by some as a reasonable corporate resources decision. . . ." <u>Decision Memorandum</u> at 5. The court would go one step further and add that not just "some" but <u>all</u> would view such a production change as a reasonable corporate resource decision. What were Inmax Holding's other options? Continue to export through Inmax at 39.95%? Commerce concludes that the otherwise reasonable corporate resource decision "is a form of

deliberate manipulation, via cash deposit avoidance, to undermine or evade the full effect of the Order." Id. For Commerce, "this activity purposefully undermines the Order by seeking to avoid the application of [Inmax]'s AD cash deposit rate determined in the investigation." This conclusion implies that there is only one true cash deposit rate for the Inmax companies, the total AFA petition rate assigned to Inmax, rather than the two rates that Commerce actually assigned.

The court is surprised at Commerce's sudden epiphany that Inmax and Inmax Industries could shift production between them. Inmax and Inmax Industries actively sought to be collapsed in the investigation, meaning that they implicitly conceded the basis for collapsing—a potential for manipulation of price or production, 19 C.F.R. § 351.401(f). Commerce chose not to collapse them, and assigned a separate rate to each company. The court therefore does not understand how production and exportation by Inmax Industries under its validly assigned rate avoids "paying the investigation rate." Commerce found there was no co-mingling of subject merchandise between the Inmax companies, which should have clarified for Commerce that the public disclosure of parent Inmax Holding was not some bold pronouncement of fraudulent intent to "evade" the order, but instead, a transparent explanation of production adjustments because of the magnitude of the total AFA rate compared to the all-others rate.

Despite having assigned the all-others rate to Inmax Industries, Commerce suggests that Inmax Industries should have exported under Inmax's total AFA rate:

> Inmax Industries began selling the subject merchandise to the United States and entering it under the all-others rate, rather than [Inmax's] rate, just as

> the companies announced they would do. . . . The issue here is whether the proper AD cash deposit rate is being applied to entries.

Decision Memorandum at 11. Commerce again intimates there is one proper cash deposit rate—the higher one. For Commerce, the cessation of exports from Inmax and increase in imports from Inmax Industries "would and could" undermine "the efficacy and integrity of the Order (and ultimately the integrity of the trade remedy laws) and unnecessarily delay the application of the statutory remedy for a significantly long time (i.e., nearly two years, or more) before the completion of the first [administrative review]." Id. at 10.

This is quite a flourish, but is too vague to have much meaning. The court is unsure what "statutory remedy" Commerce is referencing. Is Commerce referring to collapsing two affiliated companies via a changed circumstances review prior to the first administrative review? If so, the court notes that the statute contemplates a two-year (24 month) limitation on such a remedy, 19 U.S.C. § 1675(b)(4). Or is Commerce referencing some other "statutory remedy"?

The court is also having trouble with the conclusion that Inmax Holding, Inmax, and Inmax Industries have undermined the integrity of the order. Both Inmax and Inmax Industries are being reviewed in the first administrative review in which they have been collapsed. The final rate assigned in that proceeding will be the liquidation rate for the entries subject to cash deposits set in the investigation. Any cross-border price discrimination is therefore being mitigated at specific rates calculated in the first administrative review (as opposed to less precise, derivative cash deposit rates set in the investigation) and payment to the United States is secured by the cash deposits for

any resulting duties owed. And here, rather than illegally ship Inmax's merchandise "through" Inmax Industries, Inmax Holding honored the dictates of the order by taking the time and incurring the expense to retool Inmax Industries, observe corporate formalities, and export Inmax Industries' subject merchandise under the all-others rate. Rather than undermine the integrity of the order, the Inmax companies appear to have upheld it. If the goal of the antidumping statute and antidumping duty orders is to level the playing field and mitigate cross-border price discrimination, see <u>RZBC Grp. Shareholding Co. v. United States</u>, No. 15-00022, 40 CIT \_\_\_, \_\_\_, 2016 WL 3880773, at *1 (June 30, 2016) (explaining that the purpose of antidumping duties is to level the playing field and fight price discrimination), it is hard to conclude that those objectives are being undermined here. If, however, the antidumping statute is being used for some <u>other</u> purpose, for example, to effectively lock out or embargo subject merchandise through aggressive assignment of high, petition-based, total AFA rates, then that objective was, indeed, undermined by the Inmax companies.

      The court agrees that upon initiation, the record suggested that Inmax may have been evading the order by shipping its merchandise "through" Inmax Industries. During the review, however, Commerce determined this was not happening. Commerce maintains that the "good cause" standard is "higher" than a typical changed circumstances review. This means there needs to be something more than mere changed circumstances. With the absence of the original contemplated evasion (Inmax shipping its merchandise through Inmax Industries), it appears we are dealing with an ordinary changed circumstances review. And it is neither remarkable nor noteworthy that Inmax

and Inmax Industries should be collapsed—they sought that treatment all along. The more interesting question is what Commerce should have done when it discovered that there was no actual evasion of the order by the Inmax companies. Did the good cause justifying the review suddenly evaporate with the finding of no evasion? Posed another way, having invested time and resources in the review, should Commerce have completed it and collapsed the Inmax companies as it did, or should Commerce have terminated the review once it discovered that Inmax was not exporting "through" Inmax Industries?

The court will remand this matter to Commerce to address that question as well as the following questions:

1. What specific "statutory remedy" is Commerce referencing on page 10 of the <u>Decision Memorandum</u>?

2. How is the integrity of the order undermined if Inmax did not illegally ship its merchandise through Inmax Industries, but rather, ceased production and Inmax Industries exported its own subject merchandise? It seems the opposite conclusion applies, that Inmax and Inmax Industries were upholding the integrity of the order and observing the legal formalities required for their exports. Also, given that Inmax and Inmax Industries have been collapsed in the first administrative review, and therefore actual, specific, calculated rates will supersede the cash deposit rates assigned during the investigation, won't any cross-border price discrimination for the effected entries be remedied as intended by the statute?

3. Given the wide disparity in the assigned rates to the Inmax companies, and given that both companies were fully cooperating in the contemporaneous first administrative review in which the companies were collapsed, what specific statutory purpose did Commerce achieve in consolidating the investigation rates at the higher total AFA rate, rather than simply wait for completion of the first administrative review to both set the liquidation rate for the first AR entries as well as the new cash deposit rate for the Inmax companies?

Accordingly, it is hereby

**ORDERED** that the Final Results are remanded to Commerce for action in accordance with this opinion.

                                                     /s/ Leo M. Gordon
                                                    Judge Leo M. Gordon

Dated: December 4, 2017
       New York, New York